UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

ERNESTO DEJESUS,

                                   Plaintiff,

                    vs.                                                      9:06-CV-1496
                                                                             (J. Scullin)

DR. LESTER WRIGHT and
DR. MARIO DOUYON DE AZEVEDO[1];
                                   Defendants[2].

_____

ERNESTO DEJESUS, Plaintiff *Pro Se*
ADELE M. TAYLOR-SCOTT, Assistant Attorney General for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to the undersigned for Report and

Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States

District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint[3], plaintiff alleges that Dr. Lester Wright

and Dr. Mario Douyon De Azevedo were deliberately indifferent to plaintiff's

serious medical need of care for nerve damage in his left knee.  (Dkt. No. 7 ("Am.

---

[1]Plaintiff refers to this defendant as Dr. Azevedo.  According to the Acknowledgment of Service, the person in question is Dr. Mario Douyon De Azevedo.  (Dkt. No. 23).  The court will refer to this defendant by using the proper spelling.

[2]The court includes only the remaining defendants in the caption.

[3]In this recommendation, the court will only discuss plaintiff's remaining claims. Plaintiff abandoned several claims against other defendants when he filed his Amended Complaint.  (Dkt. No. 7).  The court dismissed any claims against Nurse Warner because the Amended Complaint failed to state any specific claims against her.  (Dkt. No. 8).  On a motion to dismiss by Defendants Good, Eagen and Wright, Senior District Judge Scullin granted the motion in part, and dismissed claims against Defendants Goord and Eagen.  (Dkt. No. 35).

Compl.")).  Plaintiff seeks substantial monetary relief.  (Am. Compl. at 14-15[4]).

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56.  (Dkt. No. 51).  Plaintiff opposes the motion, and has filed a response in opposition to the motion.  (Dkt. No. 54).  This court recommends that defendants' motion to dismiss be granted, and the case be dismissed as to the remaining defendants, Drs. Wright and De Azevedo.

## DISCUSSION

1.  **<u>Summary Judgment</u>**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the "'the pleadings, depositions, answers to interrogatories, and

---

[4]Where the court can refer to plaintiff's numbered paragraphs, it will.  On the pages where there are no numbered paragraphs, the court will refer to the page number.

admissions on the file, together with any affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 23).  The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings.  *Id*.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Id*.  A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## 2.   Facts

Plaintiff is currently incarcerated at Franklin Correctional Facility in Malone, New York.  (Dkt. No. 56).  The following is largely repeated from Senior District Judge Scullin's March 2008 Memorandum Decision and Order granting in part, and denying in part a motion to dismiss by some of the defendants.  (Dkt. No. 35).  It is

not necessary to recount plaintiff's entire medical history related to his knee because of the very limited claims that remain in this action.  In his amended complaint, plaintiff states that, prior to his incarceration, he suffered an injury to his left knee. (Am. Compl., Facts at ¶ 1).  Upon entering the Department of Correctional Services ("DOCS") system, plaintiff asserts that he sought treatment for his knee injury.  *Id*. Plaintiff does not provide specific dates in the complaint, but claims he was evaluated, and it was determined that plaintiff would need surgery.  Plaintiff was referred to a specialist, Dr. Mitchell Rubinovitch, who performed a total knee replacement on November 2, 2004.  (Am. Compl., Facts at ¶¶ 2-3, 11).  Although the operation appeared to have been successful, shortly after the surgery, plaintiff told his medical providers that he was experiencing severe pain and numbness in his left foot.[5]  *Id*. at ¶¶ 3, 12.

The surgeon initially informed plaintiff that the numbness was normal after surgery and that the feeling in plaintiff's foot would return.  (Am. Compl., Facts at ¶ 3).  Dr. Rubinovitch prescribed physical therapy, and plaintiff asked the therapist about the loss of feeling in his left foot.  *Id*. at ¶ 4.  According to plaintiff, the therapist told plaintiff that what he was feeling was not the normal result of knee surgery and that the foot should have recovered from any "normal" loss of sensation.

---

[5]The court notes that plaintiff's amended complaint appears to have two sets of facts. The beginning of plaintiff's amended complaint states facts very generally with no dates associated with certain events.  *See* Am. Compl., Facts at ¶¶ 1-10.  Then, plaintiff returns to the beginning of his story and realleges some of the events from the beginning of the complaint, together with dates and names of individuals involved in the events.  *Id*. at ¶¶ 11-49.  The court has attempted to piece together plaintiff's entire story from both sections of the complaint.

*Id*.

Plaintiff stated that on a routine visit to Dr. Craig Richards[6] sometime after the November 2004 surgery, he told the doctor that the pain in his leg was "excruciating;" and therefore, plaintiff was scheduled for an appointment with Dr. Rubinovitch.  (Am. Compl., Facts at ¶ 13).  Plaintiff states that, by letter dated January 27, 2005, Dr. Rubinovitch notified Dr. Richards about the increased pain in plaintiff's foot and discussed the possibility that plaintiff had some nerve damage that was causing the pain.  *Id*. at ¶ 14.  On February 25, 2005, plaintiff told Dr. Rubinovitch that the pain in his left foot had not improved, and the doctor recommended that plaintiff's physical therapy be extended for an additional eight weeks.  Plaintiff claims that on February 27, 2005, Dr. Rubinovitch specifically asked Defendant Dr. Wright to extend plaintiff's physical therapy, but on March 28, 2005, Defendant Dr. Wright denied the request.  *Id*. at ¶¶ 16-17.  According to plaintiff, on April 28, 2005, Defendant Dr. Wright again denied the extended physical therapy but approved an orthopedic consultation.  *Id*. at ¶ 18.

Defendant Dr. Wright submitted a declaration in which he denied that he was personally involved in any decision-making about plaintiff's physical therapy,

> I do not personally review requests for consult.  When a request is made, it is sent to an outside reviewer, APS, a nationally certified utilization review company, used by many fortune [sic] 500 companies that contracts with DOCS to perform this service.  APS can either approve or disapprove a request or refer it back to the facility provider for more

_____

[6]Dr. Richards is a physician at Upstate Correctional Facility and is not named as a defendant in this case.

5

information. The entire process is done electronically between my coordinated specialty care staff, APS and the facility where the inmate is housed. If the facility provider wants to appeal a denial, the provider directs the appeal to one of the five regional medical directors, senior physicians who work directly for me. If the regional medical director denies the appeal, the facility can appeal that decision to me. That did not happen in this case.

(Dkt. No. 51, Wright Dec'l at ¶¶ 6-11). The medical records show that on February 23, 2005, Physical Therapist Roberts requested approval for eight more visits to increase plaintiff's range of motion and strength in his knee and ankle. (Dkt. No. 51, Wright Dec'l, Ex. B at 42[7]). In the notes for plaintiff's physical therapy on March 2, 2005, the provider[8] wrote "Pls. extend for 3x/wk for 12 visits to continue improvement to knee range of motion . . .". (Dkt. No. 51, Wright Dec'l, Ex. B at 44).

The medical records do not include a February 27, 2005 request by Dr. Rubinovitch to Defendant Wright to extend physical therapy. However, the medical records do show letters from Dr. Rubinovitch to Dr. Craig Richards on both January 27 and March 31, 2005.[9] (Dkt. No. 51, Wright Dec'l, Ex. B at 32 and 45. In the January letter, Dr. Rubinovitch requests, "[p]lease continue his Physical Therapy and include his pain meds. I would like to see him back here in 2 month's time to check on him further." *Id*. at 32. A handwritten notation in the upper-right corner of the

---

[7]Defendants failed to number any of the pages in any of the exhibits. The court, therefore, numbered the pages.

[8]The provider's name and title are illegible.

[9]Plaintiff separately submitted over 200 pages of documents related to his case, including the two letters dated January 27 and March 31, 2005. However, plaintiff does not submit any letter from Dr. Rubinovitch dated February 27, 2005.

January letter states "OK" followed by the date "2/6/05". It is unclear who made the handwritten notation. In the March letter to Dr. Richards, Dr. Rubinovitch states, "I would appreciate him still having some Physical Therapy to work on both strength and extension of his knee . . . I would like to see him again in 3 month's time to check on his progress." *Id*. at 45. A handwritten notation along the right side of the March 31 letter starts with the letters "Cl" followed by the date "4/12/05". *Id*. The handwriting continues, "Done Albany refused more PT," then "I already consulted more PT," followed by illegible initials and the date "4/12/05". *Id*. Again, it is unclear who made the notations, and the initials are illegible. *Id*.

The final two pages of the medical records attached as Exhibits to Defendant Dr. Wright's Declaration are computer printouts. (Dkt. No. 51, Wright Dec'l, Ex. B at 46-47). The computer printouts are titled "Health Services System" and "Referral Decision" and appear to be copies of the exact same computer printout. *Id*. The first copy included in the medical records shows that a referral request dated March 3, 2005 was denied. *Id*. at 46. The medical records submitted by defendants do not include a request for more physical therapy dated March 3, 2005. The computer printout indicates that the initial decision to deny the request was made on March 9, 2005, and the "committee decision" to deny the request was made March 11, 2005. *Id*. The notes state "aatient [sic] has completed 30 sessions of [physical therapy] s/p knee surg 11/04. No indication of continued benefit offered here. Suggest F/U with ortho prior to any consideration for additional sessions." *Id*.

The second copy includes exactly the same information and appears to be the same printout, but also shows handwritten notations that appear to have been written by two different people.  (Dkt. No. 51, Wright Dec'l, Ex. B at 47).  The first notation shows the letters "Cl" followed by the date "5/3/05."  The second notation is "ORTho [illegible] above, no further PTH, address health concerns at 3 month interim visit per Dr. Richards, 5-3-05".  *Id*.

Plaintiff claims that Dr. Rubinovitch also recommended an increase in pain medication and that this was initially denied, but that on November 4, 2005, the pain medication was increased for the morning dose only.  (Am. Compl., Facts at  ¶ 19).  Plaintiff states that on October 6, 2005,  "defendants" were informed that plaintiff was suffering from "severe axonal neuropathy."  *Id*. at ¶ 20.  Plaintiff contends that he was "eventually transferred to Bare Hill Correctional Facility,"[10] where he was placed in a top bunk in a housing unit far from the medical unit.  *Id*. at ¶ 21.  Plaintiff states that he suffered for more than one year without treatment for his damaged foot. *Id*. at ¶ 22.

Plaintiff alleges that he filed grievances on March 3 and 23, August 8 and 24, September 13 and 17, October 17, and December 18, 2005.  (Am. Compl., Facts at ¶¶ 23, 28, 32).  Plaintiff claims that the nursing staff verbally harassed him by stating that his foot impairment was the result of another medical condition from which plaintiff suffered.  *Id*. at 8, 27.  Plaintiff filed some of the grievances to which he

---

[10]Plaintiff does not appear to indicate where he was incarcerated before his transfer to Bare Hill.

refers against the nursing staff for the emotional suffering allegedly caused by their conduct. *Id*. at ¶¶ 27-28.  In his Amended Complaint, plaintiff states that he notified Defendant Dr. Wright and the Commission on Corrections that his serious medical needs were being ignored and that his complaints were being "mis-titled to avoid the real issues of the complaints in an effort to divert attention away from the investigations of any other agency," but does not detail the dates that he claims to have written letters to these officials. *Id*. at ¶ 29.

Plaintiff submitted a packet of 223 numbered documents[11] of assorted medical and grievance records to the court in August 2007.  (Plaintiff's Records).  The packet includes **one** letter[12] dated October 21, 2005 written by plaintiff to Defendant Dr. Wright.  (Plaintiff's Records at 52).  Plaintiff's letter included a number of complaints about the care he received at Bare Hill Correctional Facility related to his leg and foot.  *Id*.  Plaintiff's records also include two responsive letters to plaintiff from the Regional Health Care Administrator of DOCS dated October 28 and December 27, 2005.  (Plaintiff's Records at 53, 168).  The letters begin with the statement "Dr. Wright has asked me to respond to your recent letter."  *Id*.  The October 28, 2005 letter states that the Division of Health Services "has investigated

---

[11]Most of the 223 documents are only one page.  Very few of the documents have two pages, and those additional pages are not numbered.  The court has not cited to any of the "second" pages, and so relies on plaintiff's numbering of the documents.

[12]It is unclear why defendants did not separately submit these highly relevant documents (Plaintiff's Records at 52, 53, 77, and 168).  The documents go directly to the question of personal involvement by Defendant Dr. Wright.  Defendants also do not address the documents in any way in any of the Declarations or the Memorandum of Law at Docket Number 51.

your concerns with the health staff at Bare Hill Correctional Facility.  I have been informed that you are scheduled in the near future to see an Orthopedic Specialist.  It appears that your medical needs are being met." *Id*. at 53.  The December letter states "I have been informed that you saw the Orthopedic Specialist on November 3, 2005 and you are scheduled for an appointment with the Orthopedic Surgery Specialist.  You also saw the facility physician on November 29, 2005 and you will be scheduled for another follow up appointment.  It appears that your medical needs are being met." *Id.*at 168.

Defendant Dr. Wright also responded on January 6, 2006 that the Division of Health Services had investigated plaintiff's concerns.  (Plaintiff's Records at 77).  The letter begins, "[t]his is in response to your recent letter.  The Division of Health Services has investigated your concerns with the health staff at Bare Hill Correctional Facility." *Id.*  The rest of the text of Defendant Dr. Wright's letter is exactly the same as the text of the December letter from the DOCS Regional Health Care Administrator, and does not include any additional information.  Plaintiff does not include any other letters to Defendant Dr. Wright, or any other responses from Defendant Dr. Wright or his staff.  (*See* Plaintiff's Records).

Plaintiff's 223 page submission includes a number of letters (in addition to his grievances) that plaintiff wrote to various state and DOCS agencies, as well as outside agencies, in which plaintiff complains about the medical care of his left leg, as well as their responses.  *Id*. at 75, 82, 84, 85, 95, 118, 121, 122, 123, 143, 144,

10

145, 146, 147, 148, 149, 150, 153, 154, 155, 182, 184, 187, 188, 189, 203, 211, 212, 213, 215).

Plaintiff claims that on November 3, 2005, Dr. Rubinovich informed the "defendants" that plaintiff was suffering from "Neuropraxia postoperatively," but nothing was done to address plaintiff's medical needs.  (Am. Compl., Facts at ¶ 30). Plaintiff states that, after fourteen months of suffering, he was referred to Dr. Marco R. Bernard for a consultation.  *Id*. at ¶ 41.  According to plaintiff, Dr. Bernard determined that, because the damage to plaintiff's peroneal nerve had been left untreated for over fourteen months, plaintiff's prognosis for repair of the damage was not good.  *Id*. at ¶¶ 41, 43.  Plaintiff alleges that Dr. Bernard also determined that, after the knee surgery, plaintiff had developed a "soft tissue mass," causing hematoma, numbness, and weakness over the left lower extremity.  *Id*. at ¶¶ 42-43.

In addition, plaintiff claims that a neurosurgeon examined him on April 13, 2006, and recommended exploratory surgery to correct the nerve damage, however, plaintiff states that he has been "informed" that any attempt to operate now could result in the loss of his foot or his leg due to the great delay in providing treatment for his condition.  (Am. Compl., Facts at ¶¶ 45-47).  Finally, plaintiff states that his attorney contacted Defendant Dr. De Azevedo, who stated that plaintiff had been scheduled for surgery.  However, the surgery was cancelled.  *Id*. at ¶ 48.  Plaintiff generally claims that, although he was made promises regarding medical his care, these promises were never kept.  *Id*. at ¶ 37.

11

In the list of his claims, plaintiff alleges that "Doctor Azevedo continues to violate plaintiff's rights by failure to provide adequate medical care and treatment, then providing false statements when investigations by state agencies and plaintiff' [sic] attorney inquires as to the status of the surgery." (Am. Compl. at 14). However, in his numbered paragraphs of facts, plaintiff makes clear that the focus of his claim against Defendant Dr. De Azevedo is that the doctor assured plaintiff's attorney "that the plaintiff is scheduled for the surgery, and that the surgery had not been canceled. However, plaintiff had already obtained a copy of the consent form which clearly states that the operation had, yet again been canceled. The result is a blatant disregard for plaintiff's serious medical condition, with malicious intent." (Am. Compl., Facts at ¶ 48). Plaintiff mentions Defendant Dr. De Azevedo only once in either of the fact sections in the complaint.

Defendant Dr. De Azevedo submitted some of plaintiff's medical records as exhibits to his Declaration in support of the motion for summary judgment. (Dkt. No. 51, De Azevedo Dec'l, Ex. B[13]). The medical records include entries to plaintiff's Ambulatory Health Record ("AHR"). *Id*. In an entry dated May 26, 2006, the provider wrote "Sched for Neuro Surgery, on cal. 6-27-06 for Albany Med. Ctr." and "on cal 7-4-06 for NPO". *Id*. at 33. Although it is unclear on which date the surgery was scheduled, the entry indicates that the surgery was scheduled. *Id*. Dr. De Azevedo states in his Declaration that he "performed the pre-operative physical

---

[13]Defendants did not number any of the pages in the exhibits to Dr. De Azevedo's Declaration. The court has numbered the pages.

12

and examination on June 15, 2006." (Dkt. No. 51, De Azevedo Dec'l at ¶ 14).  The medical records include the form that Dr. De Azevedo filled out during the physical and examination.  (Dkt. No. 51, De Azevedo Dec'l, Ex. B at 35-37).  The first page of the form has the handwritten notation "surgery 7/5/06".  *Id*. at 35.  The notation is crossed out.  *Id*.  In his Declaration, Dr. De Azevedo states his belief that "scheduling is handled by the secretaries in the medical office in conjunction with the hospital.  I had no say or control over scheduling decision.  I did not scratch out the date, and I have no knowledge of information about why the date was changed."  (Dkt. No. 51, De Azevedo Dec'l at ¶ 15).

     At some point, plaintiff became aware that the surgery scheduled for July 2006 would not or did not occur, and he wrote to the Prisoners' Legal Services of New York ("PLSNY").  On October, 3, 2006, PLSNY  wrote a letter to Dr. De Azevedo and asked why the surgery had not been performed.  (Dkt. No. 51, De Azevedo Dec'l, Ex. A).  Dr. De Azevedo responded on October 10, 2006, by writing at the bottom of the letter, "L leg surgery is scheduled (pending soon).  IT WAS NEVER CANCELED."  *Id*.  In his Declaration, Dr. De Azevedo states that his "response to the inquiry by Prisoner Legal Services was based upon my review of plaintiff [sic] medical records as they existed at the time.  Based upon those records, I appropriately responded that plaintiff was scheduled for surgery, and that the surgery was not cancelled.  As demonstrated from the records, I was not the physician who referred plaintiff for exploratory neurosurgery.  I was not responsible for nor did I

have any say in when the surgery would be scheduled, and I did not have a hand in its purported delay."  (Dkt. No. 51, De Azevedo Dec'l at ¶¶ 21-23).

At his deposition, plaintiff testified that in the time period around 2006 and 2007, he was not sure how many times he saw Dr. De Azevedo.  Plaintiff testified "[i]t could be five times.  It could be three times.  I don't know."  (Deposition Transcript ("Depo.") at 19).  Plaintiff also testified that he did not know if Dr. De Azevedo personally scheduled the surgery, or if Dr. De Azevedo cancelled it.  (Depo. at 21).  Plaintiff acknowledged that the surgery was eventually performed on March 28, 2007.  (Depo. at 15).

## 3.   **Respondeat Superior and Personal Involvement**

It is well-settled that in order to be held liable for damages in a section 1983 action a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978).  The doctrine of respondeat superior is inapplicable to section 1983 claims.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973), *cert. denied*, 414 U.S. 1033 (1973).

In *Williams v. Smith*, the Second Circuit detailed the various ways in which a defendant can be personally involved, and thus, in a constitutional deprivation, be subject to individual liability.  *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).  A supervisory official is said to have been personally involved if that official directly participated in the infraction.  *Id*.  A supervisory official is said to have been

14

personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id*. Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id*. Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id*.

Defendants argue that Defendant Drs. Wright and De Azevedo were not personally involved in plaintiff's alleged violations. (Dkt. No. 51, Mem. of Law at 5). In the Amended Complaint, plaintiff claims that Dr. De Azevedo personally cancelled or rescheduled the surgery originally scheduled for July 2006, and that plaintiff suffered because of the delay. (Am. Compl., Facts at ¶ 48). Plaintiff also alleges that Dr. De Azevedo maliciously provided incorrect information about the status of the surgery to plaintiff's counsel. *Id*. At his deposition, plaintiff contradicted his earlier assertions in the Amended Complaint when he acknowledged that he did not have any personal knowledge of whether Dr. De Azevedo was involved in either the scheduling or re-scheduling of the surgery. (Depo. at 21). In his Declaration, Dr. De Azevedo states that his response to PLSNY was "based upon my review of plaintiff [sic] medical records as they existed at the time." (Dkt. No. 51, De Azevedo Dec'l at ¶ 21).

Regardless of the correctness of the information[14] that Dr. De Azevedo

---

[14]There may exist an issue of fact as to whether the original surgery was cancelled or rescheduled, and the timing and the reasons for the delay. However, these possible issues of fact

provided to PLSNY, it is clear that Dr. De Azevedo was not personally involved in the consultations that led to the surgery, the scheduling of the surgery itself, or any delay after the surgery did not occur as originally scheduled. Plaintiff himself states in the Amended Complaint that private doctors rendered his diagnosis and recommended surgery. It appears that Dr. De Azevedo's ***only*** involvement with the treatment of, and surgery on, plaintiff's knee was when Dr. De Azevedo performed the pre-operative physical and examination on June 15, 2006. (Dkt. No. 51, De Azevedo Dec'l, Ex. B at 35-37). Conducting the pre-operative interview and examination does not confer upon Dr. De Azevedo responsibility for the subsequent scheduling or rescheduling of the surgery. The motion for summary judgment should be granted as to Defendant Dr. De Azevedo, and the claims against Defendant Dr. De Azevedo should be dismissed.

Plaintiff makes two separate claims against Defendant Dr. Wright, both related to the medical care that plaintiff received for his left knee. Plaintiff's claims against Dr. Wright are that Dr. Wright failed to respond to plaintiff's letters and failed to rectify the ineffective care plaintiff received at Bare Hill Correctional Facility (Am. Compl., Facts at ¶ 29), and that Dr. Wright personally denied additional physical therapy sessions for plaintiff (*Id*. at ¶¶ 16-18). It is apparent from Dr. Wright's Declaration that he was not personally involved in the decision not to continue plaintiff's physical therapy. Plaintiff has not refuted in any way that the decision-

---

are not material to the legal determination of whether or not Defendant Dr. De Azevedo was personally involved in any of those decisions.

making in this regard was performed by APS, and has not submitted any records to indicate that Dr. Wright is factually mistaken about how the process occurred in this case. Therefore, plaintiff's claim against Defendant Dr. Wright regarding continuation of physical therapy fails for Dr. Wright's lack of personal involvement, and should be dismissed.

Plaintiff's claim that Dr. Wright failed to remedy the allegedly insufficient care that plaintiff received is narrow since it concerns a specific timer period. Plaintiff does not allege that there were any letters to Dr. Wright other than the one dated October 21, 2005. (Plaintiff's Records at 52). Dr. Wright responded on January 6, 2006. *Id*. at 77. Therefore, for the purposes of Dr. Wright's personal involvement, plaintiff's only complaint is about medical care that plaintiff received ***prior to*** Dr. Wright's response. Plaintiff has made no claim that he wrote Dr. Wright again at any time after Dr. Wright's response in January 2006, or that Dr. Wright should have been aware of any aspect of plaintiff's medical care after January 2006.

Generally, letters by inmates to DOCS officials do not, standing alone, establish liability under 42 U.S.C. § 1983. *Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (cataloguing cases holding that informal letters to supervisory officials alleging constitutional violations do not render the officials personally liable for the purported violations). In this case, however, plaintiff's letter does not stand alone and is, in fact, accompanied by Defendant Dr. Wright's response to plaintiff's letter. Therefore, an issue of fact may exist as to Defendant Dr. Wright's personal

17

involvement with plaintiff's medical care prior to Dr. Wright's response in January 2006. There court will therefore proceed to analyze whether Defendant Dr. Wright was deliberately indifferent to plaintiff's medical needs.

### 4. **Medical Care**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 310 (S.D.N.Y. 2001)(citation omitted). Thus,

18

if unnecessary and wanton infliction of pain results from the denial of treatment, or if

the denial of treatment causes the inmate to suffer a lifelong handicap or permanent

loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v.*

*Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).

In order to meet the second element, plaintiff must demonstrate more than an

"inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing

*Estelle*, 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were

"deliberately indifferent" to that serious medical condition. *Id*. In order to rise to the

level of deliberate indifference, the defendants must have known of and disregarded

an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at

702). The defendants must both be aware of the facts from which the inference could

be drawn that a substantial risk of serious harm exists, and they must draw that

inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837

(1994)).

Disagreement with prescribed treatment does not rise to the level of a

constitutional claim. *Sonds*, 151 F. Supp. 2d at 311. Prison officials have broad

discretion in determining the nature and character of medical treatment afforded to

inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of

his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1086). The fact that

plaintiff might have preferred an alternative treatment or believes that he did not get

the medical attention he desired does not rise to the level of a constitutional

19

violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

The court does not make a finding as to the first element of the standard, that is, whether or not plaintiff had a serious medical need. As to the second element of the deliberate indifference standard, it appears that when contacted by plaintiff, Defendant Dr. Wright or one his subordinates initiated an investigation that concluded that plaintiff's medical needs were being met. The results of the investigation showed that after plaintiff's October 21, 2005 letter (Plaintiff's Records at 52), plaintiff had an appointment with an Orthopedic Specialist in November 2005 and was scheduled for an appointment with an Orthopedic Surgery Specialist (*id*. at 168 and 77). At the point that it was clear that plaintiff was receiving ongoing care for his medical needs, Dr. Wright's office closed the investigation. That plaintiff disagreed with the results of the investigation, or with Defendant Dr. Wright's response, does not constitute a claim of deliberate indifference under the Eighth

Amendment.  Because Defendant Dr. Wright was not deliberately indifferent to plaintiff's medical needs, the court recommends that the motion for summary judgment as to Defendant Dr. Wright be granted.[15]

    **WHEREFORE** it is hereby

    **RECOMMENDED**, that the motion for summary judgment on behalf of defendants, Drs. Wright and De Azevedo (Dkt. No. 51) be **GRANTED**; and it is further

    **RECOMMENDED**, that the remaining claims be **DISMISSED IN THEIR ENTIRETY**.

    Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Date: August 7, 2009

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

---

[15]This court's decision was more difficult because defendants did not include pertinent copies of all letters between plaintiff and Defendant Dr. Wright.  There was also no reference to this correspondence in Dr. Wright's Declaration.  Nevertheless, the court was able to examine the existing record to make its decision.

21